UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

In re:

BARTLEY L. HATCH and DIANA L.
HATCH,

          Debtors.
_____/

Case No. DK 11-02449
Hon. Scott W. Dales
Chapter 7

BELLO PARADISO, LLC,

          Plaintiff,

v.

BARTLEY L. HATCH and DIANA L.
HATCH,

          Defendants.
_____/

Adversary Pro. No. 11-80307

OPINION AFTER TRIAL

I.  INTRODUCTION

This case involves a tangled web of deception surrounding the sale of fashionable Pandora jewelry, and has more than its share of plots, subplots, and Shakespearean overtones. While both parties to this dispute were busy deceiving the jeweler, one of them picked the other's pocket. Although it is tempting in such a case to cry "a plague on both your houses,"[1] after sifting through the evidence, especially the email trail that documents the deception with surprising candor, the court has concluded that the Plaintiff is entitled to judgment in its favor.

---

[1] William Shakespeare, Romeo and Juliet, Act 3, Scene 1, 90–92.

This Opinion constitutes the court's findings of fact and conclusions of law in accordance with Fed. R. Civ. P. 52, made applicable to this adversary proceeding by Fed. R. Bankr. P. 7052.

## II.  JURISDICTION

The court has jurisdiction over the Debtors' bankruptcy case pursuant to 28 U.S.C. §§ 157(a) and 1334(a), and the United States District Court's referral under LCivR 83.2(a).  This adversary proceeding is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(I) in which the court may enter final judgment.  The court also has ancillary jurisdiction to establish the amount of the debt at issue.  *Longo v. McLaren (In re McLaren)*, 3 F.3d 958, 965 (6th Cir. 1993).

## III.  ANALYSIS

The following recitation comes from the trial testimony of Messrs. Davies and Hatch, and the exhibits admitted at trial, including the transcripts of the depositions of Matthew Davies ("Mr. Davies") (Exh. J), Bartley Hatch ("Mr. Hatch")(Exh. 24) and Diana Hatch ("Mrs. Hatch") (Exh. 25).

A.     Background

In May 2008, the Debtors, Bartley and Diana Hatch, opened a women's clothing and accessories boutique called "Isabelle's."  Mrs. Hatch, who had some limited experience working in a gift shop, ran and managed the store while Mr. Hatch, who was at one time a CPA, took care of the books in his spare time while working at Whirlpool Corporation.

One day in the summer of 2008, two sales representatives from Pandora Jewelry, LLC ("Pandora"), walked into Isabelle's and spoke to Mrs. Hatch about carrying Pandora's  jewelry line.  Exh. 25, 15:9-16:9.  Pandora is primarily known for the glass beads it designs, manufactures and sells, but it also makes other products like readymade "mix and match"

jewelry.  Through the years, Pandora has developed a healthy demand for its beads that is closely identified with its brand and trademark.

Several months after the visit from the Pandora representative, the Hatches decided to sell the line.  Mrs. Hatch performed an internet search and found a website that she thought was Pandora's, but was in fact a website operated by Plaintiff Bello Paradiso, LLC ("Bello"). Exh. 25, 19:15-17.  A representative at Bello named Molley disclosed that Bello was not Pandora or an authorized Pandora retailer, but she did offer Mrs. Hatch a loan to purchase the start-up inventory that Pandora required to begin carrying its line.  Exh. 25, 19:23-20:3.  As the relationship between the Hatches and Bello developed, it became clear that Bello's willingness to make the startup loan depended upon the Hatches' agreement to re-sell Pandora beads to Bello.

The reason Bello made this offer was that it could not purchase inventory for itself directly from Pandora because it had no retail store, and was not an authorized Pandora retailer. Evidently, Pandora wanted its customers to have an actual retail experience and did not want anyone to sell its product exclusively over the internet, as Bello did.  Nevertheless, Bello sold Pandora beads by recruiting retailers to purchase more beads than they could sell in their respective stores, and purchasing the surplus beads at cost or slightly above cost, depending upon the agreement.  This arrangement violated the Authorized Retailer Agreement that Pandora required of its retailers, including the Hatches.  More specifically, Section 7(d) of the Agreement provides:

> All sales of Pandora Jewelry Products must be at retail only.
> Authorized Retailer may not sell or ship Pandora Jewelry Products
> to any other retailer or wholesaler without prior written consent of
> Pandora, which consent may be withheld in Pandora's sole
> discretion.

Exh. 1, p.3, Sec. 7(d).  In other words, Bello's business model was based on recruiting retailers who were willing to breach their contract with Pandora and ignore any possible trademark, copyright or other intellectual property protections that Pandora might enjoy.

In exchange, for a retailer's cooperation, Bello would usually purchase its share of the beads for 10% above the authorized retailer's cost.  It would then re-sell the beads on the internet for less than Pandora's authorized retailers.

At some point, Pandora became aware of Bello and its business model, and on December 19, 2008, it filed suit against Bello in the United States District Court for the Eastern District of California, alleging patent and trademark infringement, copyright violations, and unfair competition.  Exh. B.

In February 2009, the Hatches, on behalf of Isabelle's, signed the Authorized Retailer Agreement with Pandora even though they immediately planned to breach it.  They were aware that Pandora was suing Bello for damages allegedly resulting from similar arrangements Bello made with other authorized retailers, but they nevertheless agreed to supply beads to Bello under the following conditions.

First, the parties decided that instead of Bello's purchasing beads from the Hatches at 10% above cost, Bello would make a $16,000.00 interest free loan to the Hatches (the "Start-Up Loan") to enable them to buy the initial Pandora inventory.  When Isabelle's ordered beads from Pandora, it would also order beads for Bello, of course while concealing Bello's interest in the transaction.  Bello would wire-transfer money into the Debtors' personal bank account, which they were supposed to use to pay for Bello's disguised purchase.  The Debtors would then keep Isabelle's portion of the order and ship Bello's share using shipping labels that Bello supplied for this purpose.

The parties further agreed that the Debtors did not have to repay the loan in cash. Instead, for every dollar of Pandora inventory the Debtors re-sold to Bello, Bello would reduce the Start-Up Loan by 10% of the purchase. *See* Exh. 3. In addition, the parties would continue the arrangement for about one year, or until the Debtors re-sold $240,000.00 worth of beads to Bello. After that time, Bello would continue to order Pandora product through the Debtors at 10% over Isabelle's cost, plus shipping. Finally, Bello, through its owner Mr. Davies, made it clear that Bello only wanted beads and nothing else. Bello especially did not want Pandora's line of "mix and match" jewelry because it was difficult to sell.

This arrangement worked to the Hatches' advantage, not only because it enabled Isabelle's to become a Pandora retailer at no start-up cost and without a formal loan, but also because they were about to enter into a gross sales lease with a landlord under which the rent was determined, in part, on sales volume. By selling to Bello in this manner, the Hatches believed that they did not have to give a share of these sales to the landlord because the jewelry did not go "through the storefront." Transcript of Trial held January 19, 2012 (hereinafter "Trial Tr.") at 118: 13-119:1.

So, on February 13, 2009, Mr. Davies wired the Debtors $16,000.00 to fund the Start-Up Loan, plus $10,500.00 as an advance payment for its first order of beads. The Hatches placed the order, Pandora filled it, and shortly thereafter the Hatches shipped $10,500.00 worth of beads to Bello. On March 17, 2009, Mr. Davies placed another order with the Hatches and wired them $15,333.00. Due to several genuine family emergencies, however, the Debtors delayed placing the order, and instead they "dipped into" the wire transfer, using approximately $4,000.00 for family purposes.

In May, Mr. Hatch admitted this misappropriation to Mr. Davies and promised to replace the money as soon as possible. *See* Exh. 8, p. 1. Even so, the Hatches postponed placing the order corresponding to the March 17, 2009 wire transfer for almost five additional weeks. To complicate accounting matters further, Pandora was often unable to fill an entire order, presumably because it did not have the merchandise in stock. The resulting backorders made it seem difficult to keep track of Bello's share of the orders, which the Hatches apparently used to their advantage in keeping Mr. Davies in the dark about the status of the accounting.

Because Mr. Davies was losing confidence in the Debtors, and to avoid confusion, after the March wire-transfer Mr. Davies started wiring money for the orders only after the Debtors placed them and after Pandora indicated it was ready to ship. Trial Tr. at 38:13-18.

The following table[2] summarizes the parties' transactions beginning with the money Bello wired in March for product not ordered until May:

| Date Order Was Placed by the Debtors | Date Money Was Transferred by Mr. Davies | Amount of Money Wired by Mr. Davies | Merchandise Provided From Debtors to Bello | Amount Debtors Owed to Bello Excluding Loan |
|---|---|---|---|---|
| 5/4/2009 | 3/17/2009 | $15,333.00 | $ 9,634.35 | $3,965.65 |
| 5/20/2009 | 5/28/2009 | $ 3,000.00 | $ 2,469.00 | $4,496.65 |
| 6/3/2009 | 6/5/2009 | $ 6,500.00 | $ 6,500.00 | $4,496.65 |
| 6/26/2009 | 6/10/2009 | $   325.00 | $ 1,198.00 | $3,623.65 |
| 6/22/2009 | 6/23/2009 | $11,436.00 | $11,436.00 | $3,623.65 |
| 7/29/2009 | 7/30/2009 | $17,657.23 | $17,645.00 | $3,635.88 |
| 7/24/2009 | 8/3/2009 | $ 1,962.00 | $   346.00 | $5,251.88 |
| 10/1/2010 | 9/23/2009 | $17,688.00 | $15,649.00 | $7,290.88 |
| Multiple | 10/13/2009 | $15,803.00 | $18,259.00 | $4,834.88 |
| 10/28/2009 | 11/3/2009 | $14,112.00 | $14,071.00 | $4,875.88 |

Regardless of their assurances to Bello, this table shows that the Debtors did indeed dip into the money again sometime in the month of July.

---

[2] The court bases this table largely on Exh. H, modified to eliminate the debt allocable to the Start-Up Loan and any sales-related credits, and to remove a shipment that Bello contends it did not receive. Bello does not seek a ruling with respect to the Start-Up Loan, but only with respect to the debt related to the other wire transfers.

In the meantime, Pandora's lawsuit against Bello was progressing to the point where the Honorable Dale A. Drozd ordered Bello to disclose to Pandora the names of all existing suppliers. *See* Exh. L (referring to the November 19, 2009 "Stipulated Protective Order"). The Protective Order, which was not included as an exhibit in this adversary proceeding, forbade Pandora from acting on the disclosure (for example by terminating Authorized Retailer Agreements) so long as the suppliers continued to do business with Bello. Trial Tr. at 66:3-13. It was therefore imperative to Bello and its suppliers that their relationships did not lapse because if they did, Pandora could then take action against the offending authorized retailers. *See, e.g.*, Exh. I (order de-designating suppliers).

In early September, before the Protective Order, Mrs. Hatch suggested to Mr. Davies that Pandora might not be suspicious of their subterfuge if they placed a larger order than usual in order to stock up for the Christmas season. Exh. 14. As a result, about a week after the Protective Order was issued, Mr. Davies wired the Debtors $16,508.42 on November 25, 2009, to order beads (the "November Wire"). The Debtors placed the order, but before filling it, Pandora (who now knew Isabelle's was re-selling beads to Bello in violation of its Authorized Retailer Agreement) scheduled a visit purportedly to view Isabelle's in-store inventory.

After Mr. Hatch informed Mr. Davies that Pandora was coming to visit the store, and after he shared his concern that Pandora had become suspicious about the large order, Mr. Davies told him to tell Pandora that the size of the order was a mix-up resulting from a lack of communication between the spouses. Exh. 19, p.3. When the Pandora representatives arrived, Mr. Hatch explained just that, and therefore felt compelled to cancel the order, and submit a revised one conforming to Pandora's suggestions. Most likely because it was aware that Isabelle's was Bello's cohort, Pandora then insisted that Isabelle's become an advanced level

retailer by purchasing larger amounts of product, including some "mix and match" jewelry.  Mr. Hatch, who was not aware that Pandora by then knew of Isabelle's improper re-sales to Bello, felt he had no choice because if he refused, Pandora might become aware of his complicity with Bello.  He agreed to place the order and thereby become a higher level retailer.  *Id.*

Pandora puts its retailers in one of three categories or levels, depending upon a retailer's sales volume:  White, Silver and Gold.  The more volume a retailer sells, the higher the level it can attain.  This generally means that a "Gold" retailer, for example, would have better access to the most popular beads, and presumably fewer backorder problems like those that dogged Isabelle's (and Bello) in 2009.  Also, as a higher level retailer, a shop would have access to other product lines, such as the "mix and match" line of higher-priced jewelry.  However, according to Mr. Davies, Pandora's "mix and match" items were not well-received by consumers who generally preferred the less expensive beads.  Mr. Davies testified that no level of retailer wanted to carry Pandora's "mix and match" jewelry because it was "dead inventory."   Tr. 47:2. Certainly, Bello was not interested in purchasing any "mix and match" items from Isabelle's, and had made that clear from the outset.

Therefore, after the meeting with the Pandora representatives, Mr. Hatch emailed Mr. Davies to tell him that he had allayed Pandora's suspicions, but was impelled to become a Silver level retailer.  As such, he was going to use some or all of the money from the November Wire to purchase the required "mix and match" inventory.  Exh. 19, p.3.

Mr. Davies vehemently objected, demanding that Mr. Hatch return the November Wire. Mr. Hatch refused, saying, "[w]ith or without your authorization, I will use your money to minimize the suspicion your ordering behavior has caused."  *See* Exh. 19, p.1.

As promised, Mr. Hatch ordered the "mix and match" jewelry, along with $4,319.00 in beads that he sent on to Bello on December 7, 2009. Exh. 21. After this, there was no further buying relationship between the parties. Eventually, because Isabelle's ceased to be a current supplier to Bello, Isabelle's lost the protection of the Protective Order, and Pandora terminated its Authorized Retailer Agreement. This meant that Isabelle's had two weeks to rid itself of all Pandora jewelry inventory or risk legal action. Tr. 102:4-14.

Shortly thereafter, Pandora and Bello settled the trademark lawsuit, much to the delight of Mr. Davies who was "very happy" with the outcome. Exh. C. Isabelle's, which had struggled from its inception, went out of business, Mr. Hatch left his job with Whirlpool Corporation, and the Debtors filed a voluntary bankruptcy petition under Chapter 7.

Bello filed this adversary proceeding alleging fraud under 11 U.S.C. § 523(a)(2)(B); embezzlement under 11 U.S.C. § 523(a)(4); and willful and malicious injury to property under 11 U.S.C. § 523(a)(6), and asked for damages in the amount of $21,576.82. None of this amount includes the Start-Up Loan, as Bello made clear at trial.

B.      Exception to Discharge

1.      Fraud (11 U.S.C. § 523(a)(2))

A debt is nondischargeable under 11 U.S.C. § 523(a)(2)(A) if it is for money "obtained by ... false pretenses, a false representation, or actual fraud ..." Bello, as the party invoking that statutory provision, must prove, by a preponderance of the evidence, that the Hatches "obtained money through a material misrepresentation that at the time [they] knew was false or made with gross recklessness as to its truth" and that they intended to deceive Bello. *Atassi v. McLaren (In re McLaren)*, 990 F.2d 850, 852 (6th Cir. 1993).

The evidence at trial in support of Bello's fraud theory did not persuade the court. The fraud theory depended upon the supposition that the Hatches deceived Mr. Davies into believing that they were operating Isabelle's during the months of January through May, 2009, when (according to Mr. Davies) they were not. Mr. Davies testified that he would not have advanced funds to the Hatches if he had known that Isabelle's was not operating at the time.

First, the court is not persuaded that Isabelle's was not operating. Rather, it is more likely than not, and the court finds, that Isabelle's was operating sporadically during the time the Hatch family was recovering from the loss of Mrs. Hatch's sister and brother-in-law. Other family members, such as Mrs. Hatch's mother and daughter, pitched in to help the family business, off and on, during this period. Exh. 25, 8:24, 22:12-14.

Second, the court credits Mr. Hatch's testimony that Mr. Davies (and therefore Bello) was aware of the business interruptions related to the family tragedies and the relocation of Isabelle's from its old location to a new, larger store. On cross-examination, Mr. Hatch recalled that he may have spoken by telephone with Mr. Davies in January or February, 2009, about the status of the store and the relocation.

Third, Mr. Davies knew that he was providing a Start-Up Loan, at least with respect to the Hatches' new Pandora jewelry business. Mr. Davies impressed the court as a shrewd operator who, more likely than not, would have inquired into the status of the retail operations because it was crucial to carrying out his scheme to dupe Pandora into selling product to Bello through Isabelle's. To do so, Mr. Davies knew Pandora required its authorized retailers to display inventory. Mr. Davies was intimately acquainted with Pandora and its operations because Bello had been an authorized dealer at one time, and because of similar arrangements in

which he persuaded other retailers to re-sell to Bello.  Therefore, if Isabelle's was not displaying inventory, he knew Pandora would be suspicious.

Accordingly, Bello did not sustain its burden of proof under 11 U.S.C. § 523(a)(2)(A).

2.      Embezzlement (11 U.S.C. § 523(a)(4))

For purposes of discharge litigation under 11 U.S.C. § 523(a)(4), the courts define embezzlement as follows:

> . . . "embezzlement" under section 523(a)(4) [is] "the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." *Gribble v. Carlton (In re Carlton)*, 26 B.R. 202, 205 (Bankr.M.D.Tenn.1982) (*quoting Moore v. United States*, 160 U.S. 268, 269, 16 S.Ct. 294, 295, 40 L.Ed. 422 (1895)).  A creditor proves embezzlement by showing that he entrusted his property to the debtor, the debtor appropriated the property for a use other than that for which it was entrusted, and the circumstances indicate fraud.  *Ball v. McDowell (In re McDowell)*, 162 B.R. 136, 140 (Bankr. N.D. Ohio 1993).

*Brady v. McAllister (In re Brady)*, 101 F.3d 1165, 1172-73 (6th Cir. 1996).  Because embezzlement, by definition, involves a situation in which the debtor initially has lawful possession of the property at issue, it is not necessary for a creditor to prove that a debtor's misrepresentations induced it to part with property.  Rather, the creditor needs only to prove misappropriation and "circumstances indicating fraud," such as circumstances suggesting that the debtor intended to conceal the misappropriation.  *Cash America Financial Services, Inc. v. Fox (In re Fox)*, 370 B.R. 104, 117 (6th Cir. BAP 2007); *Powers v. Powers (In re Powers)*, 385 B.R. 173 (Bankr. S.D. Ohio 2008).

Based primarily upon the documentary evidence, specifically emails from Mr. Hatch and his summary of transactions included as part of Exhibit H, the court has no difficulty concluding

that the Hatches misused some of the funds Bello wired to them for the express and limited purpose of purchasing Pandora beads for Bello, as its agent. Except for the Start-Up Loan, every dollar Bello wired was for a specific purpose, and "earmarked" for purchasing Pandora beads. *See also* Exh. J (Transcript of December 8, 2011 Deposition of Matthew Davies at 30:1-10). To the extent the Hatches delivered Pandora product to Bello, they did not misappropriate the funds. But, to the extent the Hatches diverted the earmarked funds under circumstances indicating fraud, they must answer for it by shouldering a non-dischargeable debt in that amount.

Mr. Hatch, in an email dated June 9, 2009, clearly admitted that he and his wife "dipped into your money." *See* Exh. 10. In that email, he indicated that the debtors misused the funds sometime between March 14 and March 24, 2009, while their brother-in-law remained in the hospital. *Compare* Exh. 5 (indicating that brother-in-law died on March 24, 2009, ten days after his initial head injury) *with* Exh. 10 (admitting that the Debtors took the money during the "15 day period we were paying to keep two families in a hotel near the hospital where my brother-in-law eventually passed away.").

Although Mr. Hatch seemed relatively candid about the misappropriation in an email dated May 26, 2009 and again on June 9, 2009,[3] significantly the March 31, 2009 email he sent while he was diverting the funds or immediately thereafter paints a different picture:

> Matt - Your current order should be processed by Pandora within the next three days. Sorry for the delay but I neglected to transfer the money into the proper account and they cancelled the order. I just placed the order again after having been away from the office for the past two weeks.
>
> Just after Christmas my wife's sister passed away after a year long battle with cancer. She was survived by three children and their father. On March 14th, the father suffered a fall resulting in a

---

[3] *See* Exh. 6 ("[I] still have not been able to replace your money" to cover cost of a backorder.) *and* Exh. 10 ("I wish we were in a position to repay you the $4000 we owe you right now.")

series [sic] head injury.  On March 24th, he passed away.  Diana and I have assumed custody of their children and are working with our existing children to get through this difficult time.  Thanks for understanding.

*See* Exh. 5.  Though this March 31, 2009 email does mention a fund transferring error, significantly it fails to mention that the Hatches used the money to pay for their own *personal* expenses.  This omission is consistent with concealment.  Although other evidence suggests that Mr. Hatch reported the misappropriation to Mr. Davies sometime in April, *see* Exh. G, the court regards the omission in the March 31, 2009 email as significant, though not dispositive, evidence of circumstances indicating fraud.  The Hatches had enough awareness of "the proper account" yet failed to mention the misappropriation.

The March 31, 2009 email is significant, however, in another way, also suggesting the Hatches' duplicity and concealment.  In that email, Mr. Hatch refers to "your current order" that Pandora supposedly cancelled for non-payment, and he specifically says that "I just placed the order again . . ." *See* Exh. 5.  Similarly, in his email dated April 9, 2009, Mr. Hatch offers another explanation for why Bello has not received the goods it paid for with the March 17, 2009 wire:  "I think they attempted to deliver your order to our old store location."  *See* Exh. 6.  The next week, he again states that he "placed the order as noted below," all in response to Mr. Davies's questions concerning why he has not received any inventory.

The summary of orders that Mr. Hatch prepared, however, shows no invoices for orders between February 26, 2009 and May 4, 2009.  *See* Exh. H.  The Hatches' own summary, therefore, suggests that Mr. Hatch was prevaricating in the March and April emails about having placed orders and about possible explanations for the delays, perhaps to buy time and conceal the diversion until he could come up with a solution.

Indeed, reading the various emails, primarily but not exclusively from Mr. Hatch, gives the impression that the Debtors were creating a smokescreen of confusion with excuses for delays in ordering, delays in shipping, backorders, orders shipped to wrong addresses, miscommunication among themselves, and miscommunication with Pandora. It is significant that the Debtors and Mr. Davies used the same ruse aimed at Pandora in which to explain the unduly large order placed later in the year, by persuading Pandora that Mr. Hatch and Mrs. Hatch got their wires crossed. *See* Exh. 19 (explaining to Mr. Davies that Mr. Hatch thought he duped Pandora by blaming a suspicious order "on the lack of communication between Di[ana] and I (as you suggested)."). It is not a big stretch to infer, as the court does, that the Hatches earlier employed a similar form of obfuscation with Mr. Davies to conceal the fact that they had misappropriated approximately $4,000.00 in late March, and nearly $1,200.00 in the following months. *See* Exh. 10 (June 9, 2009 email telling Mr. Davies that "Diana and I miscalculated who had what money in the confusion.").

It is difficult to accept Mr. Hatch's suggestion that he miscalculated anything. First, and most generally, until he permitted his license to lapse sometime in 2007, he was a certified public accountant, and during the relevant period he held a responsible management position at the Whirlpool Corporation. According to his deposition testimony, he worked as an accountant or consultant for some of the country's larger accounting firms before joining Whirlpool. He is a sophisticated actor, trained and licensed as a professional accountant. His supposed error seems most unlikely. Second, in an email dated February 12, 2009, before Bello had even wired any funds, he considered setting up a separate account in Isabelle's name, but rejected the idea in favor of an existing personal account, with the caveat that it "will only be used for our business with you . . ." *See* Exh. 3. The Hatches were well aware of the need to segregate the funds they

received from Bello (beyond the $16,000.00 start-up loan), and gave Mr. Davies the impression that the funds would be separate, though deposited in a personal account. Again, it seems implausible that the Hatches mistakenly "dipped into" Bello's money.

After they confessed that they diverted Bello's money in Mr. Hatch's June 9, 2009 email, and after Mr. Hatch apparently told Mr. Davies that the misappropriation "wouldn't happen again," the Hatches nevertheless misappropriated approximately $1,200.00 more. *Compare* Exh. 10 (June 9, 2009 admitting that the debt for the diverted funds was $4,000) *with* Exh. 15 (September 10, 2009 email admitting that the debt for the diverted funds is $5,176.00). If the initial misappropriation had been the product of mistake or inadvertence during the storm of financial needs following the two family members' deaths and the resulting disruption in late 2008 and early 2009, one would have expected the misappropriation to have ceased after the Hatches realized their supposed mistake. Instead, however, the misappropriation continued, along with the email obfuscation.

In addition to the admitted misappropriation, the record, taken as a whole, establishes other circumstances that "indicate fraud." Although at the time their family life was remarkably tragic, the Hatches' hardships establish a motive to embezzle, not an excuse.

At trial, Mr. Davies agreed that Mr. Hatch's "reconciliation" included as Exhibit H accurately summarized the wire transfers his company made. In addition, except for the supposed November 17, 2009 delivery of goods in the amount of $6,818.00, Mr. Davies testified that Exhibit H accurately summarized the product that Bello received from the Hatches. Accordingly, in determining the extent of the Hatches' embezzlement, the court relies heavily on Exhibit H.

First, the court credits Mr. Davies's testimony that his company did not receive the $6,818.00 reflected in Exhibit H. The record contains no evidence to contradict his assertion. Second, Mr. Davies appeared to be well-versed in the numbers involved in his business and he clearly kept closer tabs on the Isabelle's transactions than the Hatches, who consistently commingled funds and inventory. Accordingly, the court will not reduce the Hatches' debt by the $6,818.00 as they propose in Exhibit H because Bello established that it never received that shipment.

Second, the reconciliation in Exhibit H is inaccurate in at least two other respects. The evidence established that Bello's original wire transfer in the amount of $26,500.00 included the Start-Up Loan in the amount of $16,000.00 (which Bello does not attempt to recover through this adversary proceeding), and $10,500.00 advanced to purchase Pandora product. Accordingly, the court will deduct $16,000.00 from the bottom line that the Hatches believe remains due. This would result in a credit in the Hatches' favor. However, on the debit side, the Hatches ask the court to reduce their debt by $12,057.74, representing the "10% Fee" that the parties agreed would reduce the $16,000.00 Start-Up Loan. Just as the court must exclude the Start-Up Loan from the bottom line of Exhibit H, so too must it exclude the payments applicable to that loan. The parties did not agree that the 10% reduction would apply to the Hatches' tort liability. Accordingly, the court will add $12,057.74 back into the Hatches' calculation of their debt.

Having reviewed the record and giving due weight to the demeanor and credibility of the two witnesses, the court finds that Mr. and Mrs. Hatch embezzled funds in the amount of $5,176.00, as summarized in Mr. Hatch's September 9, 2009 email to Mr. Davies. *See* Exh. 15. Although that email technically constitutes an admission that they used only 95% of the $5,176.00 for family purposes, the other circumstances described persuade the court that, in fact,

that figure measures 100% of the embezzlement.  After that email, however, the court calculates that the Hatches paid down that debt, generally by delivering product, so that by October 13, 2009, the Hatches owed only $4,834.88 in embezzled funds.

It appears that their debt to Bello increased after October 13, 2009, but Bello did not persuade the court that the circumstances after that time indicated fraud against Bello, as much as they indicated fraud against Pandora to disguise the Hatches' purposeful violation of Pandora's Authorized Retailer Agreement.  *See* Exh. 19 (emails from Mr. Hatch dated December 3, 2009 and December 7, 2009 indicating that Pandora was "very suspicious coming in but by the end of the meeting they were thoroughly convinced we are ok!" and referring to use of "subterfuge [against Pandora] to a degree beyond my expectations."); *see also* Exh. 18 ("anyone [from Pandora] taking a close look will know this can't be right for our store.  You said after our last order we would stay low for a while?").

Based on a preponderance of the evidence, the court finds that the Hatches together embezzled $4,834.88.

3.      Willful and Malicious Injury (11 U.S.C. § 523(a)(6))

Although the embezzlement seemed to have ceased by the Fall of 2009, the court finds that Mr. Hatch converted funds in December 2009, as Isabelle's relationships with Bello and Pandora were deteriorating.

The documentary evidence establishes without controversy that Mr. Davies wired the November Wire to Mr. Hatch to purchase additional Pandora bead inventory.  *See* Exh. H (Hatches' transaction summary); Exh. 22, at p. S-12 (United Bank account statements).  The record also establishes that Mr. Davies and the Hatches originally agreed to use these funds only

for purchasing Pandora beads.  Late in 2009, however, Messrs. Hatch and Davies disagreed about how to deal with Pandora, and therefore how to use the November Wire.

E-mail correspondence between Messrs. Davies and Hatch reveals that both initially regarded the upcoming Christmas retail season as a good opportunity to purchase larger quantities of product from Pandora without arousing Pandora's suspicions that Isabelle's was flouting the Authorized Retailer Agreement.  *See* Exh. 14 (email from Mrs. Hatch to Mr. Davies dated September 9, 2009, stating that Pandora representatives "told me that we need to get are [sic] [C]hristmas orders in asap, so I dont [sic] think they will think anything if you want to place a large order."); Exh. 18 (email from Mr. Davies to Mr. Hatch dated November 14, 2009, stating that "We are in the thick of Pandora's busiest time so we can really place some big orders without anyone having any idea.").  Nevertheless, in late 2009, Mr. Hatch came to believe that Pandora was getting suspicious.  In view of these fears, Mr. Hatch told Mr. Davies that he did not favor placing a large order.  *See* Exh. 18, p.1.  Regardless, Mr. Davies persuaded him to place a large bead order, against the latter's "better judgment."  *Id.*

In Mr. Hatch's view, his prediction came to pass when Pandora contacted him about the unusually large order.[4]  However, in a December 3, 2009 email congratulating himself on pulling the wool over the Pandora representatives' eyes, he explained:

> They were very suspicious coming in but by the end of the meeting
> they were thouroughly [sic] convinced that we are ok!
> However, our success left us with no choice but to commit to the
> additional investment that will take us to the next level.  Good
> news and bad  . . . The bad news is we had no choice but to invest
> an  additional  $20k  in  an  order  that  they  helped  us  develop.

---

[4] Mr. Hatch assumed that the large order triggered Pandora's suspicion but ironically, Pandora already knew that Isabelle's was re-selling to Bello because by then, the Magistrate Judge had entered the Protective Order in the trademark litigation requiring Bello to disclose the identity of its suppliers (including Isabelle's), but prohibiting Pandora from using that information against current suppliers except in connection with that proceeding.  *See* Tr. at 71:19-72:5; Exh. L (docket sheet).

> Unfortunately, we do not have these funds and will have to use your last transfer to fund this order.  I had to blame our suspicious order on the lack of communication between Di and I (as you suggested) and hence did not have any choice but to go along with them helping us to cancel the order and develop a new one . . . I realize this wasn't in the plan but feel good about the outcome given the alternative of being out of business. . . .

Exh. 19.   In several related emails, Mr. Davies unequivocally told Mr. Hatch to return the November Wire but Mr. Hatch flatly ignored him, announcing his intention to use the money as he saw fit, contrary to Mr. Davies's instructions:  "With or without your authorization, I will use your money to minimize the suspicion your ordering behavior has caused."  *Id.* (email dated December 7, 2009).

In addition to other evidence, Exhibit 19 establishes that Mr. Hatch took no steps to conceal from Bello his intention to divert the November Wire from the original intended use.  As concealment is the hallmark of embezzlement, the court cannot classify this misappropriation of the November Wire as fraud.  It does qualify, however, as conversion that must be excepted from discharge under 11 U.S.C. § 523(a)(6).  *Compare Kasishke v. Frank (In re Frank)*, 425 B.R. 435 (Bankr. W.D. Mich. 2010) (court finds intentional misappropriation amounting to non-dischargeable conversion under 11 U.S.C. § 523(a)(6)) with *McCallum v. Pixley (In re Pixley)*, 456 B.R. 770 (Bankr. E.D. Mich. 2011) (criticizing *Kasishke* for stating too broadly that all conversion is excepted from discharge).

To ensure that the discharge protects only the honest but unfortunate debtor, a discharge does not relieve a debtor of repaying a debt that results from a willful and malicious injury to a person or property.  *National Sign and Signal v. Livingston*, 422 B.R. 645 (W.D. Mich. 2009) (*citing Kawaauhau v. Geiger*, 523 U.S. 57 (1998)).  Chief Judge Maloney recently summarized the proofs that a creditor must offer at trial:

> In order to show the debt owed falls under § 523(a)(6), the creditor must prove, by a   preponderance of the evidence that (1) the debtor's conduct was willful and malicious, (2) it suffered an invasion of its legal rights or to the legal rights to its property, and (3) the invasion was caused by the debtor's conduct.

*Livingston*, 422 B.R. at 383.  The injury -- here the diversion of the November Wire to the Hatches' new order -- must be "willful" and "malicious," because these words both modify the word "injury."  *Id.* (*citing Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 464 (6th Cir. 1999)).

The admissions in the email included within Exhibit 19 clearly establish that Mr. Hatch acted willfully.  Not only did he intend to act, but he intended that in doing so he would frustrate Bello's instructions by depriving it of the use of the November Wire, after Mr. Davies repeatedly demanded its return.  This was no mere technical conversion.  *See Pixley, supra*.

Mr. Hatch also acted "maliciously" within the meaning of 11 U.S.C. § 523(a)(6) and the case law interpreting that statute.  To find that a debtor acted "maliciously" the court must be convinced by a preponderance of the evidence that the debtor caused the injury which gave rise to the debt at issue "in conscious disregard of one's duties or without just cause or excuse." *Wheeler v. Laudani*, 783 F.2d 610, 615 (6th Cir. 1986).  Here, Mr. Davies made clear, and Mr. Hatch apparently agreed, that the latter had a duty to use the November Wire as Bello directed. It was, after all, "earmarked" for a specific purpose.  The evidence of a conscious disregard of Bello's rights could not be clearer:  "with or without your authorization I will use your money." *See* Exh. 19.

As for the possibility that Mr. Hatch had a good excuse, the court easily concludes he did not.  Certainly he felt that misappropriating the November Wire was necessary to save his business, but it was necessary to save his business from being terminated for violating Pandora's

rights under the Authorized Retailer Agreement. The desire to continue the fraud against Pandora cannot qualify as "just cause" and if it is an "excuse," it is not one the court is willing to accept.

The court notes, however, that on or about December 21, 2009, after misappropriating the November Wire, the Hatches delivered $4,319.00 in product to Bello. *See* Exh. H; Exh. 19. The court will deduct this amount from the debt arising from the misappropriation of the November Wire, and fix that aspect of Bello's claim at $12,189.42.

Finally, the preponderance of the evidence with respect to the November Wire implicates Mr. Hatch in the willful and malicious injury, but not Mrs. Hatch. Accordingly, the court will enter judgment against Mr. Hatch in the amount of $12,189.42.

C.      Bello's Unclean Hands

The Hatches urge the court to bar Bello's claim under the "unclean hands" doctrine, based on Bello's own misconduct.

Certainly, Bello is not a sympathetic plaintiff. Its business model is unseemly and parasitic. The record establishes that prior to the federal injunction against trademark infringement that Bello accepted as a condition of its settlement with Pandora, Bello's success depended upon its ability to induce people such as the Hatches to intentionally breach contracts with Pandora, some before they were even made, and to use "subterfuge" to conceal its involvement. Without the deception upon which Bello built its business, it could not trade on Pandora's brand and reap the 50% markup it enjoyed on its unauthorized re-sales of Pandora beads. It is tempting under these circumstances to invoke the unclean hands doctrine to bar Bello's recovery. The court, however, will resist the temptation for a number of reasons.

First, the Hatches did not assert Bello's *modus operandi* as the basis of their unclean hands defense.  Instead, they asserted supposed usury and impossibility of performance after Bello informed Pandora about the Hatches' contractual breaches, *i.e.*, their resale of inventory. The court's reliance on the Plaintiff's business model to support a finding of unclean hands at this point in the litigation would unfairly surprise the company.

Second, the record does not support the defense of usury.  Because the Plaintiff is not seeking a ruling of nondischargeability with respect to the initial Start-Up Loan, the interest rate on that loan is irrelevant.  Even if the Start-Up Loan were at issue, the parties agreed to an interest free loan. *See* Exh. A (February 10, 2009 email in which Mr. Davies informs Mr. Hatch that "[w]e will provide an interest free loan to you and your wife for one year").  The Hatches' reliance on Mr. Davies's deposition testimony is misplaced.  His reference to the $2,000.00 monthly pay down simply referred to the rate at which the principal would be retired (based on anticipated purchases of beads for re-sale), but did not include any interest component.  *See* Exh. J (Transcript of December 8, 2011 Deposition of Matthew Davies at 13:4-9).  To the extent that he mentioned any "ROI" or return on investment, the court finds that he was referring to the 40-50% markup he was able to earn on the illicit re-sales, not to interest on the Start-Up Loan.  In any event, the only debts at issue in this proceeding arise from the Hatches' torts. It does not make sense to assert a usury defense to an embezzlement claim.

In asserting their defense of "impossibility," the Debtors contend that by disclosing their re-sale activities to Pandora, Bello precluded them from completing their agreement with Bello. As with the usury defense, however, it takes aim at a contract claim (which Bello does not assert in this action), and has no bearing on the tort claims of embezzlement and conversion.

At trial, the Hatches also suggested that Mr. Davies threatened to reveal their contract breaches to Pandora (and therefore doom their jewelry business). Because the threat postdated the creation of the debts at issue in this adversary proceeding, the Debtors cannot establish the nexus courts generally require before invoking the unclean hands doctrine. *Hopper v. Everett (In re Everett)*, 364 B.R. 711 (Bankr. D. Ariz. 2007). Moreover, the disclosure actually predated the supposed threat because it was part of the Stipulated Protective Order. *See* Exh. L (docket sheet for *Pandora Jewelry, LLC v. Bello Paradiso, LLC*, 2:08-cv-03108, E.D. Calif., DN 106).

More generally, the court has qualms about applying the unclean hands doctrine in dischargeability litigation because the relief that a plaintiff requests under 11 U.S.C. § 523 is statutory, not simply equitable. The statute makes no provision for invoking equitable doctrines, except perhaps inferentially by analogizing a discharge to "an injunction." 11 U.S.C. 524(a)(2) and (a)(3). On the one hand, Congress clearly intended to limit the bankruptcy discharge to the honest but unfortunate; on the other hand, courts (including courts of equity) generally close their doors to plaintiffs with "unclean hands" or who have engaged in misconduct closely related to their claims for relief. The Hatches' case, however, does not require the court to decide (as others have) that the unclean hands doctrine may preclude relief under section 523. *Republic of Rwanda v. Uwimana (In re Uwimana)*, 274 F.3d 806 (4th Cir. 2001); *Adams v. Council Baradel, Kosmerl & Nolan (In re Adams)*, 254 B.R. 857 (Bankr. D. Md. 2000).

The court notes the similar role that the unclean hands doctrine and the wrongful conduct rule play. *See In re Robin*son, 2000 WL 1800604 (Bankr. N.D. Ill.). Both are designed to protect the integrity of the court by preventing it from assisting litigants in carrying on improper activities. Michigan, however, reserves the wrongful conduct rule -- a possible defense to tort claims -- for only the most egregious conduct proscribed by criminal or penal statutes. *Orzel by*

*Orzel v. Scott Drug Co.*, 449 Mich. 550 (1995).  Bello's conduct in its dealings with the Debtors was shameful in many respects but not demonstrably criminal.  The court declines to invoke the unclean hands doctrine on the present record.

## IV.  CONCLUSION

For the foregoing reasons, the court will enter judgment against the Hatches, jointly, in the amount of $4,834.88, and that debt shall be excepted from discharge under 11 U.S.C. § 523(a)(4).  In addition, the court will enter judgment against Mr. Hatch alone in the amount of $12,189.42, and that debt shall be excepted from discharge under 11 U.S.C. § 523(a)(6).  To clarify, Mr. Hatch's total non-dischargeable debt to Bello will be $17,024.30 (embezzlement and conversion), while Mrs. Hatch's non-dischargeable debt will be limited to $4,834.88 (embezzlement only).

The Clerk will enter a separate judgment conforming to this Opinion.

**IT IS SO ORDERED.**

**Dated February 12, 2012**



Scott W. Dales
United States Bankruptcy Judge